David **THOMAS**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 36518.

Court of Criminal Appeals of Texas.

Feb. 12, 1964.

Edward D. Michalek, Jr., Houston (On Appeal Only), for appellant.

Frank Briscoe, Dist. Atty., Carl E. F. Dally and Thomas C. Dunn, Asst. Dist. Attys., Houston, and Leon B. Douglas, State's Atty., Austin, for the State.

WOODLEY, Presiding Judge.

The offense is murder; the punishment, life.

The deceased, Dorothy Mae Freeman, referred to in the record as the common-law wife of the appellant, was found dead in the home she and the appellant had moved into that day when Detective C. E. Reynolds arrived. Her body was lying in the doorway of the bathroom.

Dr. Jachimczyk, who performed an autopsy on the body, testified that he found two gunshot wounds, one entering the chest and the other in the back, each of which would have been fatal, and a third gunshot wound that would not have been fatal.

He also testified that there were cuts and lacerations from some blunt instrument on the top side of the scalp, a bruise over the left cheek bone and scratch marks on the neck of the deceased.

The appellant's confession was introduced in evidence which reads, in part: "I have been living with Dorothy Mae Freeman since March 13, 1962, we lived at 1711 Cushing until yesterday and then we moved to 1207 O'Neal. Dorothy went to work around 7:00 A.M. and I started moving the things shortly after she left for work. I got through around 10:00 or 11:00 A.M. Then I went and got some paint and varnish to paint the floors, I painted until around 2:00 P.M. and then I went down the street to my baby brother's house and sent him across the street to get some beers, I stayed at his house and drank beer until about four or five o'clock. Then I went home, when I got home she was there, I mean Dorothy, I started an argument about the house and this and that. Then she said 'Why don't you shut up', then she said, 'You don't know what you are talking about.' That is when I started slapping her around, after that I told her to get the gun, that I was going to kill her. That is when she broke and got the gun. From the bedroom to the bathroom, that's where we were tussling. It was during this tussle that I got shot, it was during this tussle that she got her first shot, we were at the bathroom, then I got the gun all the way from her and I shot her again. I think I shot her four or five more times, I believe I shot her in the head, then I started hitting her in the head with the pistol. I must have hit her six or seven times with the pistol, I guess it was through passion or drun*kid*ness or something."

The appellant testified at the trial that the deceased was in the bathroom when he came to the house around 7 o'clock and as he walked in she was bending over reaching for something behind the bathroom door; that he pulled the door to him to see what she was doing and " * * * when she straightened up I was looking down the barrel of a .38 and she shot me in my left side."

He also testified that she got shot the first time " * * * in the tussle over the gun"; that there was no argument; that he had no trouble with her before he was shot and that he did not hit her with the pistol at any time.

On cross-examination he testified, in part:

"Q. You never had possession of the gun?

"A. At the time the tussling was going on I did not have the gun.

"Q. When did you get the gun?

"A. The only time I got the gun, it went off, and when it went off, I felt her body jerk. When her body jerked that is the time that she loosened her grip, and she fell on the floor, and the gun slipped out of her hand into my hand, in a split second. That's when I shot her again and again and again.

"Q. Why did you shoot then?

"A. Because I was afraid and excited. I didn't know how bad I was shot."

Mrs. Elvina Bryant testified that her house was six or eight feet from the house where she saw the appellant and the deceased about 8 P.M. on December 10, 1962; that she heard a woman scream and heard her say "Please don't kill me. Please don't. * * * I am a hard working woman. I haven't done anything," and "Somebody, please don't let him kill me"—and "Go get some help—He's on one of his rampages like he was last week."

She testified that the appellant hit the deceased and she fell and that he said "Go get my gun, you dirty S. O. B., I am going to kill you. You don't deserve to live," and she said "Please don't. Please don't. Don't you see you done beat me," and that he was still beating her when she went into the kitchen.

The witness testified that she moved so she could see in the kitchen and the appellant hit the deceased on the side of her head and she fell, and as she was trying to pull herself up he hit her again and said: "I'm going to kill you"; that the appellant and the deceased then left the kitchen and she could not see them but could hear "the rambling"; that she then heard "something like 'Pow Pow'", and "a horrible scream" —a woman's scream, then a sound "like something when you hit the floor, and the pistol said 'Boom, Boom, Boom', and I never heard no more."

Wallace Sears, son-in-law of Elvina Bryant, gave similar testimony but his version was that the appellant told the six year old daughter of the deceased to go get the gun and said "I'm going to kill *her*."

Fred Lee Kelly, who lived nearby, also gave testimony similar to that of Elvina Bryant. He testified that he heard the deceased tell the little girl to go get help and heard the appellant tell the deceased to go get the pistol.

H. L. Livingston, a mechanic, testified that as he drove up to the house he heard a noise like some kids hollering, heard a shot and a woman's scream, another shot and a shorter scream, then three more shots.

The pistol taken from the appellant after the shooting was introduced in evidence. The testimony shows that it was a .38 Smith and Wesson revolver and that it was not in working condition because the trigger guard had been bent and was touching the trigger.

Records of the Jefferson Davis Hospital were introduced to show that the appellant was treated for a gunshot wound after the shooting.

Officer J. H. Jones testified that he gave the warning which appears at the head of appellant's confession; that the statement was voluntarily given; that it was reduced to writing and signed; that the appellant was not threatened.

The appellant testified that he was given no warning and the statement was made through fear, and from threats on the part of the officers.

Officer Jones denied that any threats were made.

The issues as to the confession were submitted to the jury.

In his brief the appellant complains that photographs were admitted showing a blood stain on a sheet, a doll and the general condition of the front bedroom of the house.

The photograph is not found in the record and the complaint that it was prejudicial cannot be appraised. We observe, however, that the appellant denied that there was any trouble or argument before the shooting whereas the state's witnesses testified to seeing the appellant striking and cursing the deceased. The condition of the room, including blood spots, would appear to be relevant on the issue made by such testimony.

The evidence is sufficient to sustain the jury's verdict and we find no reversible error.

The judgment is affirmed.